AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH Facebook profile ID:<br>https://www.facebook.com/aaron.montgomery.37604/<br>Facebook profile name: Aaron Montgomery<br>located at Meta Platforms, Inc., 1601 Willow Road, Menlo Park,<br>CA 94025 | Case No. 4:23 MJ 1302 JMB<br><br>SIGNED AND SUBMITTED TO THE COURT<br>FOR FILING BY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___NORTHERN___ District of ___CALIFORNIA___ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 1343 | Wire Fraud |
| 18 U.S.C. Section 2312 | Transportation of Stolen Vehicles |
| 18 U.S.C. Section 2313 | Sale or Receipt of Stolen Vehicles |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing is true and correct.

_____
*Applicant's signature*

Nolan Kraft, Special Agent, ICE/HSI
*Printed name and title*

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: ~~26 Sept. 2023~~

_____
*Judge's signature*

City and state: St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nolan Kraft, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41, for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. d/b/a Facebook ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  The requested warrant would require Facebook to disclose to the United States records and other information in its possession pertaining to the subscriber or customer associated with the user ID as further described in attachment B.

2.      I am a Special Agent with Immigration & Customs Enforcement's Homeland Security Investigations ("HSI").  HSI is the investigative directorate of Immigration and Customs Enforcement and is the primary investigative component of the Department of Homeland Security. HSI is tasked broadly with investigating all types of cross-border and interstate criminal activity. I have held this position for approximately twelve years since my graduation from basic training at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.      I am assigned to investigative Group 1 within the office of HSI's St. Louis Office of the Assistant Special Agent in Charge. This group consists of special agents and task force officers tasked with investigating violations of federal law pertaining to the unlawful importation of controlled substances or other contraband that has/have been smuggled into the United States, as well as the interstate and international movement of illicit funds derived from the sale of these controlled substances or proceeds derived from other unlawful activities.

1

4.      I have participated in, or am familiar with, criminal investigations relating to United States Code violations, including violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 2312 (transportation of stolen vehicles), and 18 U.S.C. § 2313 (sale or receipt of stolen vehicles).  I am experienced with numerous methods of investigating such crimes, including, but not limited to, conducting visual surveillance, questioning witnesses, applying for search warrants, monitoring pen registers, reviewing telephone call detail records and precision location information, and participating in confidential source and undercover agent debriefings, etc.  I have also used records from social media companies, such as Facebook, to collect facts and other evidence in connection with my investigations.  In doing so, I have authored search warrant affidavits for Facebook accounts.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 2312 (transportation of stolen vehicles), and 18 U.S.C. § 2313 (sale or receipt of stolen vehicles), and potentially other federal statutes, have been committed by Aaron Montgomery ("**Montgomery**"), and/or other persons, known and unknown.  There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LOCATION TO BE SEARCHED

8.    The location to be searched is:

Facebook profile ID:  **https://www.facebook.com/aaron.montgomery.37604/**

Facebook profile name:  **Aaron Montgomery**

(the "**Subject Account**") located at Meta Platforms, Inc., 1601 Willow Road, Menlo Park, CA 94025, further described in Attachment A.  The items to be reviewed and seized by the United States are described in Part II of Attachment B.

## BACKGROUND RELATING TO FACEBOOK

9.    The Internet is in part a computer communications network using interstate and foreign telephone and communication lines to transmit data streams, including data streams used to provide a means of communication from one computer to another and used to store, transfer, and receive data and image files.

10.    An "Internet Protocol" (IP) address is a unique series of numbers, separated by a period, that identifies each computer using, or connected to, the Internet over a network.  An IP address permits a computer (or other digital device) to communicate with other devices via the Internet.  The IP address aids in identifying the location of digital devices that are connected to the Internet so that they can be differentiated from other devices.  As a mailing address allows a sender to mail a letter, a remote computer uses an IP address to communicate with other computers.

11.    An "Internet Service Provider" (ISP) is an entity that provides access to the Internet to its subscribers.

12.     The term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

13.     Facebook is a business and company that operates as a remote computing service, a provider of electronic communications services through ISPs. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

15.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and administrator, as well as the current status of the group profile page.

16.     A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange

4

communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

19.    Facebook allows users to upload photos and videos, which may include any metadata, such as location, that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. Facebook allows users to edit or delete comments on their own profile pages, and users can adjust their profile settings to allow them to pre-approve comments on their own profile pages.

20.    In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

21.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

22.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

23.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

24.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

25.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

26.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

27.    Facebook also retains IP logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

28.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. When a given Facebook account is deleted, Facebook retains certain information relating to that account for some period of time, including user identity information, IP logs, and other data. Even if a given user deletes data, Facebook stores such data for extended periods of time on Facebook's servers.

29.    Messages, photos, audio videos, and other records stored on Facebook's servers by a subscriber may not necessarily be located in the subscriber's home/work computer. The subscriber or user may store data on Facebook's servers for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer at his/her residence or employment. A search of the files in the computer at the subscriber's residence or place of employment will not necessarily uncover the files that the subscriber has stored on Facebook's servers. Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

30.    By their very nature, websites, social networking accounts, and Internet-based applications described herein are kept and stored in computers and electronic-memory devices by the host companies, in addition to or in lieu of hard-copy versions of this data. Because such evidence is stored electronically, the data and evidence of the crimes described herein may be stored and be present for long periods of time.

31.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

32.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the

Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

## PROBABLE CAUSE

33.    In January 2023, HSI began assisting several local law enforcement agencies located in the Eastern District of Missouri and elsewhere that reported vehicle theft incidents involving Montgomery that occurred in August and September 2022.  Specifically, incident reporting across these agencies revealed that Montgomery sought out individuals who had listed their vehicles for sale on Facebook,[1] subsequently communicated with these individuals through the **Subject Account** to arrange to meet these individuals at banks to purchase their vehicles, and ultimately consummated the purchases using fake cash.

34.    In February 2023, the United States obtained a search warrant for the **Subject Account**, which produced evidence relating to Montgomery's scheme described above.  Since then, local law enforcement agencies located in the Eastern District of Missouri and elsewhere have reported additional vehicle theft incidents involving Montgomery that occurred in April and May 2023, after Facebook had already produced records for the **Subject Account** pursuant to the previous search warrant.  Thus, this search warrant is being sought to obtain information regarding these additional incidents.

### A.    August 30, 2022 Lake Saint Louis, Missouri Incident

35.    On August 29, 2022, Montgomery messaged victim J.K. through Facebook using

---

[1] Specifically, Montgomery sought out these individuals on Facebook's Marketplace feature, which allows Facebook users to post free classified ads, including ads regarding items for sale.

the **Subject Account**, inquiring if victim J.K.'s H2 Hummer was still for sale.  That same day, victim J.K. responded to Montgomery through Facebook messaging, confirming that the H2 Hummer was still for sale and offering to meet Montgomery the next day (August 30, 2022).

36.     After exchanging further messages with Montgomery through Facebook, on August 30, 2022, victim J.K. met Montgomery (who was accompanied by an unknown person) at a U.S. Bank branch location on Lake Saint Louis Boulevard in Lake Saint Louis, Missouri to consummate the sale of victim J.K.'s H2 Hummer to Montgomery for $10,000.  After arriving at the bank, victim J.K. went inside the bank with Montgomery to complete the title transfer for the H2 Hummer.   After exiting the bank, Montgomery provided victim J.K. with an envelope containing what appeared to be cash.  After Montgomery drove away in victim J.K.'s H2 Hummer, victim J.K. opened the envelope and discovered that the envelope contained fake cash (each bill displayed bold text "FOR MOTION PICTURE PURPOSES").

37.     To date, victim J.K.'s H2 Hummer has not been recovered.

**B.     September 2, 2022 Glen Carbon, Illinois Incident**

38.     On September 1, 2022, Montgomery messaged victim B.B. through Facebook using the **Subject Account**, inquiring if victim B.B. would accept $10,000 for victim B.B.'s GMC Yukon Denali.   That same day, victim B.B. responded to Montgomery through Facebook messaging, instructing Montgomery to text or call victim B.B.'s spouse, victim E.B.  Montgomery thereafter communicated with victim E.B. by phone and arranged to meet victim E.B. the next day (September 2, 2022) at a U.S. Bank branch location on State Route 159 in Glen Carbon, Illinois.

39.      On September 2, 2022, victim E.B. met Montgomery at the U.S. Bank branch location in Glen Carbon, Illinois to consummate the sale of victim E.B.'s GMC Yukon Denali to Montgomery for $10,000.  After victim E.B. allowed Montgomery to test drive the GMC Yukon

Denali, Montgomery provided victim E.B. with a U.S. Bank envelope containing what appeared to be cash. After Montgomery drove away in victim E.B.'s GMC Yukon Denali, victim E.B. discovered that the envelope contained fake cash (each bill displayed bold text "FOR MOTION PICTURE PURPOSES").

40.     On September 19, 2022, Bellefontaine Neighbors Police Department patrol officers recovered victim E.B.'s GMC Yukon Denali after it was found unoccupied in the driveway of 10076 Ashbrook Drive, St. Louis, Missouri 63137, which is the address listed on Montgomery's Missouri driver's license and his U.S. Bank account records. When the GMC Yukon Denali was recovered, it was displaying a license plate that did not match the GMC Yukon Denali's registration but matched a different vehicle registration associated with Montgomery.

### C.     September 7, 2022 St. Louis County, Missouri Incident

41.     On September 1, 2022, Montgomery messaged victim A.K. through Facebook using the **Subject Account**, inquiring if victim A.K. would accept $20,000 for victim A.K.'s Jeep Grand Cherokee. That same day, victim A.K. responded to Montgomery through Facebook messaging, indicating that victim A.K. would not accept $20,000.

42.     On September 6, 2022, Montgomery again messaged victim A.K. on Facebook using the **Subject Account**, this time offering to pay $22,000 for victim A.K.'s Jeep Grand Cherokee. After exchanging several more Facebook messages back and forth, victim A.K. and Montgomery arranged to meet the next day (September 7, 2022) at a U.S. Bank branch location in Fenton, Missouri to consummate the sale of victim A.K.'s Jeep Grand Cherokee to Montgomery for $22,000.

43.     On September 7, 2022, Montgomery messaged victim A.K. on Facebook using the **Subject Account**, confirming their meeting later that day at a U.S. Bank branch location on

Gravois Road in Fenton, Missouri.  Shortly thereafter, victim A.K. met Montgomery at the U.S. Bank branch location in Fenton, Missouri to consummate the sale of victim A.K.'s Jeep Grand Cherokee to Montgomery for $22,000.  After arriving at the bank, victim A.K. went inside the bank with Montgomery to complete the title transfer for the Jeep Grand Cherokee.  After exiting the bank, Montgomery provided victim A.K. with an envelope containing what appeared to be cash.  After victim A.K. left the area, and after Montgomery drove away in victim A.K.'s Jeep Grand Cherokee, victim A.K. opened the envelope and discovered that the envelope contained fake cash (each bill displayed bold text "FOR MOTION PICTURE PURPOSES").

44.     In connection with the St. Louis County Police Department's subsequent investigation, victim A.K. was presented with a photographic lineup, which included six random photographs, including a photograph of Montgomery, and selected the photograph of Montgomery as being the person who provided victim A.K. with fake cash for victim A.K.'s Jeep Grand Cherokee.

### D.     September 12, 2022 Memphis, Tennessee Incident

45.     On August 10, 2022, Montgomery messaged victim M.B. through Facebook using the **Subject Account**, requesting that victim M.B. send him photos of victim M.B.'s Chrysler 300 and indicating that he could meet victim M.B. at an Independent Bank branch location.

46.     Approximately a month later, on September 6, 2022, Montgomery again messaged victim M.B. through Facebook using the **Subject Account**, indicating he could purchase victim M.B.'s Chrysler 300 on September 12, 2022.

47.     After further messages with victim M.B. through Facebook using the **Subject Account**, on September 12, 2022, Montgomery, while driving a GMC Yukon Denali (consistent in make, model, and color with the vehicle that Montgomery stole from victim E.B. ten days earlier

in Glen Carbon, Illinois), met victim M.B. at victim M.B.'s residence. Montgomery, victim M.B., and victim M.B.'s spouse then met at an Independent Bank branch location on South Main Street in Memphis, Tennessee to consummate the sale of victim M.B.'s Chrysler 300 to Montgomery for $36,000. After arriving at the bank, victim M.B.'s spouse went inside the bank, where Montgomery was already waiting. While inside the bank, victim M.B.'s spouse signed over the title to the Chrysler 300 to Montgomery and, in exchange, Montgomery provided victim M.B.'s spouse with a zipped nylon bag containing what appeared to be cash. After victim M.B. and victim M.B.'s spouse left the area, and after Montgomery left the area with victim M.B.'s Chrysler 300, victim M.B.'s spouse opened the envelope and discovered that the envelope contained fake cash (each bill displayed bold text "FOR MOTION PICTURE PURPOSES").

48.    On November 10, 2022, a Maryland Heights (Missouri) Police Department ("MHPD") officer patrolling the parking garage at the Hollywood Casino observed victim M.B.'s Chrysler 300, which was displaying an invalid license plate, and conducted a computer inquiry on the vehicle's VIN. This inquiry revealed that the vehicle was reported stolen from Memphis, Tennessee, with Montgomery listed as the suspect for the theft. The officer then reviewed the casino's video surveillance footage, which showed a black male wearing a black shirt, jeans, red sneakers, and a gray baseball cap walking from the area of the vehicle approximately thirty minutes earlier. The officer continued reviewing the surveillance footage, located a subject matching this description on the casino floor, and approached the subject, who identified himself as Montgomery. The officer informed Montgomery that he was being detained for various wanteds/warrants. The officer thereafter requested Montgomery's consent to empty out his pockets, which consent Montgomery verbally gave. When emptying out Montgomery's pockets,

the officer found a clear plastic bag containing a white powdery substance and, as a result, placed Montgomery under arrest for possession of a controlled substance.

49.    After placing Montgomery under arrest, the officer advised Montgomery of his Miranda rights and Montgomery verbally indicated that he understood these rights.    When Montgomery was subsequently questioned about how he got to the casino, he answered that he drove a white Chrysler 300 (consistent in make, model, and color with the vehicle that Montgomery stole from victim M.B. approximately two months earlier in Memphis, Tennessee).    Montgomery was thereafter taken to victim M.B.'s Chrysler 300 that the officer previously observed in the parking garage, and Montgomery identified victim M.B.'s Chrysler 300 as the vehicle that he drove to the casino that day.

### E.    April 22, 2023 Palatine, Illinois Incident

50.    On April 21, 2023, Montgomery messaged victim J.J. through Facebook using the **Subject Account**, requesting that victim J.J. meet the following day (April 22, 2023) at a U.S. Bank branch location in Palatine, Illinois to consummate the sale of victim J.J.'s Dodge Magnum to Montgomery for $22,000.

51.    On April 22, 2023, victim J.J. met Montgomery at a U.S. Bank branch location on North Rand Road in Palatine, Illinois to consummate the sale of victim J.J.'s Dodge Magnum to Montgomery for $22,000.    When victim J.J. got to the bank, Montgomery was waiting inside, and informed victim J.J. that he was unable to get a loan from the bank and therefore would only be able to pay $20,000 for victim J.J.'s Dodge Magnum.    While still inside the bank, Montgomery provided victim J.J. with an envelope containing what appeared to be cash and, in exchange, victim J.J. provided Montgomery with the keys to victim J.J.'s Dodge Magnum.    As Montgomery exited the bank, victim J.J. opened the envelope and discovered that the envelope contained fake cash

(each bill displayed bold text "FOR MOTION PICTURE PURPOSES").  Victim J.J. immediately

called 911 and exited the bank to try to stop Montgomery but Montgomery sped off in victim J.J.'s

Dodge Magnum (accompanied by two other vehicles both bearing Missouri registration).

52.    The next day, on April 23, 2023, a University City (Missouri) Police Department

officer located victim J.J.'s Dodge Magnum at a residence in University City, Missouri.  While

the vehicle was being towed, a person who lived at the residence made contact with the officer.

This person informed the officer that she had just purchased the vehicle for her son.  When the

officer later contacted this person, she informed the officer that she purchased the vehicle from

"Ron" (which was the name Montgomery used when referring to himself in a Facebook message

that he previously sent to victim M.B. using the **Subject Account**).

### F.    May 16, 2023 Holland, Michigan Incident

53.    On May 13, 2023, Montgomery messaged victim J.C. through Facebook using the

**Subject Account**, inquiring about the Jeep Grand Cherokee that victim J.C. was selling for victim

S.J.

54.    After exchanging further messages with Montgomery through Facebook, on May

16, 2023, victim J.C. and victim S.J. met Montgomery at a PNC Bank branch location on

Washington Avenue in Holland, Michigan to consummate the sale of victim S.J.'s Jeep Grand

Cherokee to Montgomery for $30,000.  After exiting the bank, Montgomery provided victim J.C.

with what appeared to be $30,000 cash (banded in $10,000 increments).  Montgomery then drove

away in victim S.J.'s Jeep Grand Cherokee (followed by another vehicle that was with him).  After

Montgomery had left the area, victim S.J. noticed that the cash provided by Montgomery "did not

feel right" and took the cash into the bank.  The bank informed S.J. that the cash was fake.  A

Holland (Michigan) police officer subsequently spoke with a bank employee, who informed the

officer that the person who provided victim J.C. and victim S.J. with the fake cash provided the name "Aaron Montgomery" when he was inside the bank.

55.     On June 26, 2023, an MHPD patrol officer (the same one who previously arrested Montgomery at the Hollywood Casino when victim M.B.'s Chrysler 300 was recovered) conducted a traffic stop of Montgomery, who was driving victim S.J.'s Jeep Grand Cherokee near the Hollywood Casino.  After a computer inquiry on the Jeep Grand Cherokee's VIN revealed that the vehicle was reported stolen from Holland, Michigan, the officer arrested Montgomery.

56.     Based on the foregoing, and as evidenced by the records obtained through the previous search warrant for the **Subject Account**, there is probable cause to believe that Montgomery used the **Subject Account** in furtherance of the above-described offenses, and that the information sought from Facebook is likely to constitute, or otherwise contain, evidence relating to the above-described offenses.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

57.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the United States copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, United States-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

58.     Based on the forgoing, I request that the Court issue the proposed search warrant. The United States will execute this warrant by serving the warrant on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time

convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

59.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

60.    I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

**I state under the penalty of perjury that the foregoing is true and correct.**

NOLAN L. KRAFT
Special Agent
Homeland Security Investigations


**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on** _____26 Sept._____ **,** 2023.

JOHN M. BODENHAUSEN
United States Magistrate Court Judge
Eastern District of Missouri

18

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the Facebook account and/or user ID:

Facebook profile ID:  **https://www.facebook.com/aaron.montgomery.37604/**

Facebook profile name:  **Aaron Montgomery**

(the "**Subject Account**") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. d/b/a Facebook, a company located at 1601 Willow Road, Menlo Park, CA 94025.

1

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Meta Platforms, Inc. d/b/a Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. d/b/a Facebook ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that has/have been deleted but is/are still available to Facebook, or has/have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose, from April 1, 2023 to the present, the following information to the United States for the account(s) and user ID(s) listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(c)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that account and user ID, including the

1

hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(d) All "check ins" and other location information;

(e) All IP logs, including all records of the IP addresses that logged into the account;

(f) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(g) All information about the Facebook pages that the account is or was a "fan" of;

(h) All past and present lists of friends created by the account;

(i) All information about the user's access and use of Facebook Marketplace;

(j) The types of service utilized by the user;

(k) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(m) All records pertaining to communications between Facebook and any person regarding the user or the account and user ID, including contacts with support services and records of actions taken;

(n) Any and all cookies associated with or used by any computer or web browser associated with the account, including the IP addresses, dates, and times associated with the recognition of any such cookie;

(o) All records of Facebook searches performed by the account;

2

(p)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(q)     All photos and videos uploaded by that account and user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(r)     All location data associated with the account created, uploaded, or shared by the account; and

(s)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests.

**Facebook is hereby ordered to disclose the above information to the United States within 14 days of the date of this warrant**.

**II.     Information to be seized by the United States**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 2312 (transportation of stolen vehicles), and 18 U.S.C. § 2313 (sale or receipt of stolen vehicles) involving Aaron Montgomery and/or other persons, known and unknown, from April 1, 2023 to the present, including, for each account or user ID identified on Attachment A, information pertaining to the following matters:

(a)     Vehicle purchases;

(b)     Vehicles for sale;

(c)     Discussions regarding the price and purchase location of vehicles;

(d)     Wire fraud, transportation of stolen vehicles, and/or the sale or receipt of stolen vehicles;

(e)     Fake money and/or fake cash and/or cash that is for motion picture purposes;

(f)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(h)     The identity of the person(s) who created or used the account(s) or user ID, including records that help reveal the whereabouts of such person(s); and

(i)     The identity of other persons interacting with the account or user ID, such as potential victims, witnesses, or co-conspirators, known and unknown to the investigation.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Meta Platforms, Inc. d/b/a Facebook ("Facebook", and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.    such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.    the process or system is regularly verified by Facebook and, at all times pertinent to the records certified here, the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                                                          Signature